STATE OF MINNESOTA

IN SUPREME COURT

A22-1545

Court of Appeals                                                              Chutich, J.
                                              Dissenting, Procaccini, J., Hudson, C.J.
Cristina Berrier,                                        Took no part, Hennesy, J.

                    Appellant,

vs.                                                                    Filed:  July 17, 2024
                                                              Office of Appellate Courts
Minnesota State Patrol,

                    Respondent.

_____

Jeremy R. Stevens, Grant M. Borgen, and Matthew B. De Jong, Bird, Stevens & Borgen, P.C., Rochester, Minnesota, for appellant.

Keith Ellison, Attorney General, Michael Goodwin, Assistant Attorney General, Saint Paul, Minnesota, for respondent.

Matthew J. Barber, Schwebel, Goetz & Sieben, P.A., Minneapolis, Minnesota, for amicus curiae Minnesota Association for Justice.

_____

S Y L L A B U S

The language of Minnesota's dog-bite statute, Minnesota Statutes section 347.22 (2022), plainly, clearly, and unmistakably waives sovereign immunity for claims brought under the statute.

Reversed and remanded.

1

O P I N I O N

CHUTICH, Justice.

We are asked to determine whether respondent Minnesota State Patrol may be sued under Minnesota Statutes section 347.22 (2022), our state's strict liability dog-bite statute. Appellant Cristina Berrier sued the State Patrol under the dog-bite statute after a State Patrol canine injured her during an unprovoked attack. The State Patrol moved to dismiss the statutory claim, arguing that it was immune from suit under the doctrine of sovereign immunity. The district court denied the motion, and the State Patrol appealed. The court of appeals reversed and remanded in a precedential opinion, concluding that the State Patrol was immune from suit. *Berrier v. Minn. State Patrol*, 992 N.W.2d 421, 427–28 (Minn. App. 2023). Because we conclude that the Legislature plainly, clearly, and unmistakably waived sovereign immunity for claims brought under the dog-bite statute, we hold that the State Patrol may be sued under that provision.

## FACTS

The allegations in Berrier's complaint, accepted as true,[1] state the following: On March 15, 2019, Berrier was working at a car dealership in Owatonna when a state trooper brought his patrol vehicle in for service, accompanied by his canine, Diesel. During the visit, Diesel, unprovoked, attacked Berrier. Berrier suffered serious injuries in the attack, some permanent.

---

[1] Following a district court's determination of a motion to dismiss, we review the allegations of the complaint de novo, accepting those facts as true and construing all reasonable inferences in favor of the nonmoving party. *Halva v. Minn. State Colls. and Univs.*, 953 N.W.2d 496, 500 (Minn. 2021).

Berrier sued the Minnesota State Patrol, alleging that her injuries were "a direct and proximate result" of the State Patrol's negligence. In her seven-paragraph complaint, Berrier did not expressly cite Minnesota's dog-bite statute. But Berrier later stated her intention to pursue a claim under the dog-bite statute, in addition to her common law negligence claim. The dog-bite statute, which imposes strict liability, provides that:

> If a dog, without provocation, attacks or injures any person who is acting peaceably in any place where the person may lawfully be, the owner of the dog is liable in damages to the person so attacked or injured to the full amount of the injury sustained. The term "owner" includes any person harboring or keeping a dog but the owner shall be primarily liable. The term "dog" includes both male and female of the canine species.

Minn. Stat. § 347.22 (2022). At a pretrial hearing, a question arose as to whether Berrier adequately pleaded her statutory claim. The district court directed the parties to brief the issue.

The State Patrol argued that Berrier's section 347.22 claim was not adequately pleaded and, regardless, that as a state agency it otherwise had sovereign immunity under the statute. The State Patrol did not challenge Berrier's right to assert a common law negligence claim in general. Berrier responded that the State Patrol's informal motion to dismiss was untimely and procedurally defective, her complaint adequately pleaded her strict liability claim under Minnesota's notice pleading standard, and the dog-bite statute evinces the Legislature's intent to waive sovereign immunity.

The district court denied the State Patrol's motion to dismiss, concluding that Berrier's complaint sufficiently pleaded her statutory claim and that the dog-bite statute waives sovereign immunity. As to sovereign immunity, the district court applied the rule

3

of construction set forth in Minnesota Statutes section 645.27 (2022)—which provides that the "state is not bound by the passage of a law unless [(1)] named therein, or [(2)] unless the words of the act are so plain, clear, and unmistakable as to leave no doubt as to the intention of the legislature"—to the dog-bite statute. The district court noted that the statute imposes liability on "the owner" of a dog, which "allows for little ambiguity" as to the State Patrol's liability. "One who owns or possesses something is necessarily its owner; the term applies not based on the form of the entity . . . but based on its relation to that which is owned." And given a statutory definition of "person" that includes "bodies politic," the court determined that the statute "evinces a clear intent to include governmental entities in the definition of 'person,' and thus 'owner.' " (Quoting Minn. Stat. § 645.44, subd. 7 (2022).)

The district court also reasoned that, for the second clause of section 645.27 to have any effect, some statutes, like section 347.22, must include language sufficient to waive sovereign immunity even when the State is not expressly referenced. The court concluded: "The categorical term 'owner' and the specific definition of 'any person' to include 'bodies politic' are about as 'plain, clear, and unmistakable' as words can be without crossing the line of naming the State itself."

The State Patrol appealed two issues: (1) whether Berrier adequately pleaded her statutory dog-bite claim; and (2) whether the State Patrol has sovereign immunity under the statute. The court of appeals reversed the district court's order and remanded the case. *Berrier*, 992 N.W.2d at 428. The court concluded that the dog-bite statute's use of the term "owner," which "could include the state," *id.* at 426, is not "so plain, clear, and

4

unmistakable as to leave no doubt" that the Legislature intended to waive sovereign immunity. *Id.* at 428 (quoting Minn. Stat. § 645.27) (internal quotation marks omitted). Because the court concluded that the State Patrol was immune from suit, it did not address whether Berrier adequately pleaded her statutory dog-bite claim.

We granted Berrier's petition for review on the issue of whether the State Patrol is entitled to sovereign immunity against a strict liability dog-bite claim under section 347.22.

## ANALYSIS

A district court order denying a motion to dismiss is, ordinarily, not immediately appealable. *See* Minn. R. Civ. App. P. 103.03. An order denying a motion to dismiss for lack of governmental immunity is, however, immediately appealable. *Cruz-Guzman v. State*, 916 N.W.2d 1, 7 (Minn. 2018). The reviewing court considers only the facts alleged in the complaint, accepts those facts as true, and construes all reasonable inferences in favor of the nonmoving party. *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553 (Minn. 2003). We review questions of statutory interpretation and the application of sovereign immunity de novo. *Nichols v. State*, 858 N.W.2d 773, 775 (Minn. 2015). When interpreting a statute, our objective "is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2022). We construe every law, "if possible, to give effect to all its provisions." *Id.*

### A.

In Minnesota, the doctrine of sovereign immunity developed through common law based on the principle that "the King can do no wrong." *Nichols*, 858 N.W.2d at 775 (citation omitted) (internal quotation marks omitted). The judicially created doctrine

5

"precludes litigation against the state unless the state has consented to suit." *Id.* But in *Nieting v. Blondell*, we abolished sovereign immunity for common law tort claims, recognizing that it was "an exception" to the fundamental concept "that liability follows tortious conduct," and that reasons to continue it were wanting. 235 N.W.2d 597, 601–03 (Minn. 1975); *see also Sterry v. Minn. Dep't of Corr.*, ___ N.W.3d ___, No. A22-0829, 2024 WL 3058749 (Minn. June 20, 2024) (discussing the abolition of common law sovereign immunity and holding that the Minnesota Department of Corrections could be held vicariously liable for intentional torts allegedly committed by a corrections officer). We noted the importance of protecting those who have suffered "harm to their persons, properties, and characters," which requires "an opportunity to obtain a reasonable and adequate remedy against the wrongdoer." *Nieting*, 235 N.W.2d at 602–03. Ultimately, we emphasized that the State "must strive, through its laws, to achieve the goals of protecting the people and of providing them with adequate remedies for injuries wrongfully inflicted upon them. So long as the state fails to do so, it will be functioning in conflict with the public interest and the public good." *Id.* at 603. Although we abolished sovereign immunity for common law tort claims, the doctrine "remains effective in many forms, including immunity from liability created by statute, which is, of course, subject to waiver by the Legislature." *Nichols*, 858 N.W.2d at 775.

*Nieting*, decided in 1975, was a marked shift in our approach to questions of sovereign immunity. And the Legislature responded a year later with the Tort Claims Act—establishing a general rule that the State is liable in tort "under circumstances where the state, if a private person, would be liable to the claimant." Minn. Stat. § 3.736 (2022).

Over a decade later, we reflected on this doctrinal change: "[P]rior to *Nieting* and the legislation governing tort claims against the state, the general rule was immunity with limited exceptions of liability. After *Nieting*, however, the general rule is now liability . . . with limited exceptions of immunity." *Nusbaum v. Blue Earth County*, 422 N.W.2d 713, 718 (Minn. 1988).

In her petition for review, however, Berrier did not argue that the Tort Claims Act allows her to bring a claim against the State Patrol under the dog-bite statute. Instead, she argued that the Legislature waived sovereign immunity for claims brought under the dog-bite statute based on the framework set out in section 645.27. Decades before *Nieting*, the Tort Claims Act, and the attendant shift in our sovereign immunity jurisprudence, the Legislature set out two circumstances when sovereign immunity is waived: "The state is not bound by the passage of a law unless [(1)] named therein, or unless [(2)] the words of the act are so plain, clear, and unmistakable as to leave no doubt as to the intention of the legislature." Minn. Stat. § 645.27. In other words, to waive sovereign immunity under clause one, a statute must name the State. To waive sovereign immunity under clause two, a statute must have some other "indication that the legislature meant it to apply to the state." *Holmberg v. Holmberg*, 588 N.W.2d 720, 727 (Minn. 1999). We focus our attention here on section 645.27, the issue raised by Berrier in her petition for review.

As we have previously explained, section 645.27 is a rule of construction, not a codification of sovereign immunity from statutory claims. *Nichols*, 858 N.W.2d at 776. The provision merely provides a framework for us to interpret whether a statute waives

7

sovereign immunity—a judicially created doctrine whose application now is the exception, not the rule. *Id.*; *see Nusbaum*, 422 N.W.2d at 718.

To be sure, the standard for a statute to waive sovereign immunity is exacting. Minn. Stat. § 645.27. But strictly applying the "no doubt" language in section 645.27—without considering the framework's purpose, the context within which it was codified, and the varied and unique circumstances in which it is applied—would require a statute to *name*, or nearly name, the State to waive sovereign immunity. That application would make the second clause of section 645.27, which requires "the words of the act [to be] so plain, clear, and unmistakable as to leave no doubt as to the intention of the legislature," meaningless. The language of its first clause, stating that "[t]he State is not bound by the passage of a law unless named therein," would suffice. But "we construe a statute as a whole and interpret its language to give effect to all of its provisions." *State v. Riggs*, 865 N.W.2d 679, 683 (Minn. 2015). With this in mind, our application of section 645.27 must give effect to the framework in its entirety *and* serve our modern approach to issues of sovereign immunity,[2] which favors subjecting the State to liability. *See Nusbaum*, 422 N.W.2d at 718.

---

[2]  In arguing that the dog-bite statute does not bind the State Patrol, the dissent relies on opinions of the Attorney General that predate our decision in *Nieting*. Not only are these opinions not binding on our court, *Billigmeier v. Hennepin County*, 428 N.W.2d 79, 81 (Minn. 1988) (stating that opinions of the Attorney General are not binding on our court), but because they predate *Nieting* they also fail to reflect our modern approach to issues of sovereign immunity.

B.

Berrier concedes that the dog-bite statute does not waive sovereign immunity by explicitly naming the State. The issue, rather, is whether the second clause of section 645.27 applies: whether the statute evinces the Legislature's "plain, clear, and unmistakable" intent to bind the State. The district court concluded that the dog-bite statute meets that standard and subjects the State to liability. The court of appeals held that it does not. As stated above, the dog-bite statute provides:

> If a dog, without provocation, attacks or injures any person who is acting peaceably in any place where the person may lawfully be, the owner of the dog is liable in damages to the person so attacked or injured to the full amount of the injury sustained. The term "owner" includes any person harboring or keeping a dog but the owner shall be primarily liable. The term "dog" includes both male and female of the canine species.

Minn. Stat. § 347.22. Berrier and the State Patrol dispute whether the use of the phrase "the owner" in section 347.22 encompasses the State. On this issue, our decision in *Hyatt v. Anoka Police Department* is notable—and broadly relevant—as it addresses whether a government entity is subject to the dog-bite statute. 691 N.W.2d 824 (Minn. 2005).

In *Hyatt*, we addressed whether the dog-bite statute applies to municipal owners of police dogs. 691 N.W.2d at 826. Applying principles of statutory interpretation, we recognized that the statute's use of the term "owner" includes "any person" harboring or keeping a dog, and that the word "any" has broad application in statutes. *Id.* at 826 (quoting Minn. Stat. § 347.22) (internal quotation marks omitted). Additionally, a statutory definition extended the term "person" "to bodies politic and corporate." Minn. Stat. § 645.44, subd. 7 (2004). We then recognized that the phrase "bodies politic" includes

9

municipalities. *Hyatt*, 691 N.W.2d at 826–27. Based on these definitions, we concluded that the plain meaning of the statute includes a municipal owner of a police dog. *Id.* at 827. We also stated that if the Legislature wanted to make the dog-bite statute inapplicable to police dogs, it could amend the section. *Id.* at 831 n.7. Notably, the Legislature has not amended the dog-bite statute since our 2005 decision in *Hyatt*.

Although *Hyatt* is relevant given its factual parallels to the present case, it does not control the outcome here. That is so because *Hyatt* does not interpret the dog-bite statute under the section 645.27 framework, which applies only to sovereign entities like the State, not to municipalities. Two of our other cases more directly address the scope of section 645.27, albeit not regarding the dog-bite statute: *Star Tribune Co. v. University of Minnesota Board of Regents*, 683 N.W.2d 274 (Minn. 2004), and *Nichols*, 858 N.W.2d 773. Because they involve section 645.27, these cases inform our analysis of whether the dog-bite statute binds the State Patrol.

In *Star Tribune Co.*, we addressed what type of statutory language suffices to bind the State when it is not expressly named in the statutory provision. There, we determined whether the University of Minnesota's Board of Regents needed to comply with the Open Meeting Law[3] in selecting a new University President. *Star Trib. Co.*, 683 N.W.2d at 278. Specifically, we addressed whether the term "public body" encompassed the University. *Id.* at 280–81. We noted that the term "public body" is broad. *Id.* And the

---

[3]     "The Open Meeting Law generally requires that meetings of state and local governments must be open to the public." *Star Trib. Co.*, 683 N.W.2d at 280 (citing Minn. Stat. § 13D.01 (2002)).

10

University was not named among the express exceptions to the law. *Id.* at 281. We also emphasized that "because the Open Meeting Law was enacted for the public benefit, we construe it in favor of public access." *Id.* at 280. Ultimately, given the broad language of the Open Meeting Law, the opinions of our court recognizing the University as a public institution, the University's absence among the law's express exceptions, and our practice of construing the Open Meeting Law in favor of public access, we held that the University was subject to its terms. *Id.* at 281. In sum, our reasoning in *Star Tribune Co.* illustrates that, to determine whether a statute binds the State when it is not expressly named, we look to (1) whether the classification of the category of potential defendants is sufficiently broad to include the State; and (2) whether the public policy interests underlying the statute at issue imply that the Legislature intended to include the State thereunder.

In contrast to *Star Tribune Co.*, in *Nichols* we addressed what type of statutory language does *not* suffice to bind the state. More specifically, we determined whether the Legislature waived sovereign immunity for claims brought under Minnesota Statutes sections 181.64 (2022) and 181.65 (2022), which prohibit "false statements as inducement to entering employment."[4] *Nichols*, 858 N.W.2d at 774 (quoting Minn. Stat. §§ 181.64–65 (2014)) (internal quotation marks omitted). The provisions applied to "any person, partnership, company, corporation, association, or organization of any kind, doing business in this state." *Id.* at 776 (quoting Minn. Stat. § 181.64). Because this language does not

---

[4] In *Nichols*, we expressly declined to consider whether the State waived sovereign immunity for *statutory* tort claims under the Tort Claims Act because the parties did not address the application of the Tort Claims Act on appeal. 858 N.W.2d at 774 n.1.

11

explicitly reference the State, we addressed whether the State was included by the phrase "organization of any kind." *Id.* at 776–77. Although the common definition of " 'organization' *could* encompass the State, it could just as easily refer only to business or other nongovernmental entities." *Id.* at 777. Because this " 'expansiveness' really has no practical limitation," and the Legislature "has applied the brakes to th[is] kind of analysis . . . by requiring a waiver of sovereign immunity to be plain, clear, and unmistakable," we concluded that the sections did not waive sovereign immunity. *Id.* We also noted that "the Legislature has named the State in at least 14 provisions within the chapter containing the statutes at issue." *Id.* The absence of a similar, explicit waiver of sovereign immunity in sections 181.64 and 181.65 was telling. *Id.*

Berrier argues that *Nichols* is distinguishable from the present case because we addressed the expansive phrase "organization of any kind," Minn. Stat. § 181.64 (2014), as compared to the precise phrase at issue here: "the owner of the dog." Minn. Stat. § 347.22. The State Patrol counters that *Nichols* controls, reasoning that although the phrase "the owner" of a dog *could* include the State Patrol, it could just as easily refer only to non-State entities. According to the State Patrol, this possibility leaves a doubt as to the Legislature's intent to waive sovereign immunity, per *Nichols*. We agree with Berrier that, although illustrative of the scope of section 645.27, our reasoning in *Nichols* is distinguishable from the facts at hand.

In *Nichols*, we addressed a statute that more clearly applied only to non-State, business entities. The provision at issue prohibited the use of false statements to induce a person to enter into employment, subjecting "any person, partnership, company,

12

corporation, association, or organization of any kind, doing *business in this state*" to civil and criminal liability. Minn. Stat. § 181.64 (emphasis added). We emphasized that the phrase "organization of any kind" could "easily refer only to business or other nongovernmental entities." *Nichols*, 858 N.W.2d at 777 (internal quotation marks omitted).

This interpretation is bolstered by the terms preceding "organization" that all clearly refer to a form of business entity—"partnership, company, corporation, association." Minn. Stat. § 181.64. The modifier "doing *business* in this state" suggests the same. *Id.* (emphasis added). And the statutory provisions at issue in *Nichols* include a "Penalties" section, which states that those who violate "any provision of section 181.64 and this section shall be guilty of a misdemeanor," another sign that the statute did not bind the State. Minn. Stat. § 181.65. Claiming otherwise—that the State itself was impliedly included in a list of entities "doing business *in this state*" or was bound by a provision imposing criminal penalties—would have been illogical. Further, the provisions at issue were part of a comprehensive statutory scheme pertaining to employment. *Nichols*, 858 N.W.2d at 777. The Legislature *explicitly* named the State as being bound in at least 14 provisions within that chapter, but not in those at issue in *Nichols*. *Id.*

By contrast, here the disputed phrase—"the owner of the dog"—is more clearly applicable to *any* potential defendant in a class than the provisions interpreted in *Nichols*. The phrase binds a party based on their relationship to the thing that is owned, not what form of entity they are. And the dog-bite statute contains no language otherwise suggesting that its application is limited to non-State entities.

C.

In sum, to determine whether the State Patrol is bound by the dog-bite statute, we ask whether the words of the statute "are so plain, clear, and unmistakable as to leave no doubt as to the intention of the legislature" to waive sovereign immunity. Minn. Stat. § 645.27. As noted above, when applying this framework, we also consider (1) the need to give effect to the "no doubt" standard so that the second clause of section 645.27 is not meaningless; and (2) our modern approach to issues of sovereign immunity, which favors subjecting the State to liability. Our precedent further suggests that, in applying section 645.27 to the dog-bite statute, we consider (1) whether the classification of the category of potential defendants is sufficiently broad to include the State; and (2) whether the public policy interests underlying the statute show that the Legislature intended to bind the State thereunder. *See Star Trib. Co.*, 683 N.W.2d at 281.

Applying these principles here, the language of the dog-bite statute does not explicitly refer to "public" entities, like the State. But the phrase "the owner" in section 347.22 is even more broadly inclusive than the phrase "public body" in *Star Tribune Co.*, a phrase sufficient to include the University of Minnesota. Unlike *Nichols*, there is no sign that the phrase is limited to non-State or business entities who own dogs. Further, in previous opinions we have recognized the State as an "owner" within the meaning of a statute. *See City of Brainerd v. Brainerd Invs. P'ship*, 827 N.W.2d 752, 758 (Minn. 2013) (holding that the State of Minnesota is an "owner" who may petition a municipality for an improvement to a public road). We also stated in *Hyatt* that the term " 'owner' includes 'any person' harboring or keeping a dog. The word 'any' is given broad application in

14

statutes, regardless of whether we consider the result reasonable." 691 N.W.2d at 826 (citation omitted). Just as we recognized that the Open Meeting Law's broadly inclusive language encompassed the University in *Star Tribune Co.*, the broadly inclusive meaning of the phrase "the owner of the dog" encompasses *any* potential dog owner, like the State Patrol.

Another parallel between this case and *Star Tribune Co.* is that the dog-bite statute, like the Open Meeting law, serves public policy interests that favor imposing liability on public bodies. *See Star Trib. Co.*, 683 N.W.2d at 281 (construing the Open Meeting Law to ensure public access). We have recognized that the Legislature specifically "considered the [dog-bite] statute to be designed for the protection of people who are subject to attacks and immediate harm from dogs." *Lewellin v. Huber*, 465 N.W.2d 62, 65 (Minn. 1991). There is little reason to distinguish between dogs owned by individual persons, municipalities, or non-State entities on the one hand, and those owned by the State on the other, if the act intends to protect all those attacked by dogs. Rather, applying the statute to *any* dog owner would serve this purpose by ensuring that claimants are compensated for dog-bite injuries and by incentivizing owners, including state agencies like the State Patrol, to control their dogs.

To this point, our dog-bite precedent generally construes section 347.22 in favor of ensuring a claimant's full recovery and subjecting a dog owner to broad liability. For example, we have interpreted the statute "to place the entire responsibility of injury on the dog's owner if the elements of the statute [are] met." *Lewellin*, 465 N.W.2d at 64. The only defenses against a dog-bite claim are those built into the law, which are when the

15

dog-bite victim (1) provokes the dog or (2) fails "to peaceably conduct [themselves] in any place where [they] may lawfully be." *Seim v. Garavalia*, 306 N.W.2d 806, 812 (Minn. 1981). And a plaintiff's potential recovery under the dog-bite statute is greater than that for traditional strict liability claims. The law subjects a defendant to absolute liability, precluding the application of comparative fault principles, meaning that "those who violate statutes such as section 347.22 cannot have their liability reduced due to the negligence of the plaintiff." *Id.* Our practice of ensuring a claimant's full recovery and subjecting a dog owner to broad liability under section 347.22 further shows that any potential dog owner, including the State, is bound by the statute.

We also note that subjecting municipal police departments to liability under the dog-bite statute, as we did in *Hyatt*, while barring suit against the State Patrol, would be an arbitrary distinction. This is particularly so because we stated in *Hyatt* that "if the Minnesota Legislature wishes to make section 347.22 of Minnesota Statutes inapplicable to police dogs . . . it will do so," and the Legislature has not amended the dog-bite statute since. 691 N.W.2d at 831 n.7; *see Engquist v. Loyas*, 803 N.W.2d 400, 406 (Minn. 2011) (stating that because the Legislature did not amend the dog-bite statute after we interpreted the statute's provocation element, we "assume that the Legislature has acquiesced in our interpretation"). More generally, those attacked by police dogs are unlikely to know whether that dog is owned by a municipal or state law enforcement agency. Given these considerations, permitting suit under one circumstance, but not the other, seems an odd and unjust result.

Finally, we note that our holding does not expose the State to broad liability. Sovereign immunity "serves to protect the fiscal stability of government." *Nichols*, 858 N.W.2d at 775. That purpose is not compromised here. According to the State Patrol, only three State agencies have active canine programs. The State Patrol, for example, has approximately 16 service dogs that are trained to detect the odor of narcotics or explosives, not in apprehension or tracking. *K-9 Unit*, Minnesota State Patrol, https://dps.mn.gov/divisions/msp/about/Pages/special-assignments-canine-unit.aspx (last visited July 15, 2024) [opinion attachment]. Because the State Patrol's service dogs are not trained in traditionally bite-related police work, there will likely be few suits brought against the State Patrol under the dog-bite statute.[5] We note, too, that our above discussion interprets the term "owner" *only* in the context of the dog-bite statute. Other statutes that use the term "owner" will naturally have different textual clues and underlying purposes that may or may not implicate State entities. Our conclusion here should not dictate how the term, in a different statute, is understood in the absence of that provision's unique context.

To the extent that our holding impacts how we apply the section 645.27 framework, it serves our modern approach to issues of sovereign immunity—liability "with limited

---

[5]     To the extent two other State agencies own dogs trained in bite-related work, the dog-bite statute has built-in defenses to protect the State from liability for lawful police activities—namely, provocation and the failure to act peaceably in a place where one may lawfully be. *Seim*, 306 N.W.2d at 812. And as we recognized in *Hyatt*, Minnesota's authorized use of force statute, Minnesota Statutes section 609.06 (2022), permits "public officers" to use "reasonable force" in certain circumstances; in those instances, "the special and subsequently enacted provisions of the reasonable force statute prevail" over the more general provisions of the dog-bite statute. *Hyatt*, 691 N.W.2d at 830.

17

exceptions." *Nusbaum*, 422 N.W.2d at 718. Both our court, and the Legislature, have taken pains to curb the judicially created doctrine. We did so almost 50 years ago in *Nieting*. 235 N.W.2d at 603. The Legislature followed suit a year later through the Tort Claims Act. Minn. Stat. § 3.736.

Any contrary holding would make clause two of section 645.27 meaningless and set back our sovereign immunity jurisprudence by focusing on justifications for sovereign immunity—like "expediency and public convenience"—that we have long repudiated. *Nelson v. McKenzie-Hague Co.*, 256 N.W. 96, 97 (Minn. 1934) (citation omitted) (internal quotation marks omitted); *see Spanel v. Mounds View Sch. Dist. No. 621*, 118 N.W.2d 795, 802 (Minn. 1962) ("Our consideration of the origins of tort immunity persuade us that its genesis was accidental and was characterized by expediency, and that its continuation has stemmed from inertia."). Ultimately, if the Legislature does not want to, in certain contexts, expose the State to liability or subject it to restrictions and regulations, it can amend any statutes accordingly.

Based upon the above, we conclude that the words of Minnesota Statutes section 347.22 are sufficiently plain, clear, and unmistakable to waive sovereign immunity.[6]

---

[6]    Because we conclude that the State Patrol is not immune from suit based on our application of section 645.27, we decline to address Berrier's alternative argument that the dog-bite statute's classification as an absolute liability statute precludes the application of sovereign immunity. We also have no need to address Berrier's argument—raised for the first time in her reply brief—that the Tort Claims Act, Minnesota Statutes section 3.736, waives sovereign immunity for claims brought under section 347.22.

18

**CONCLUSION**

For the foregoing reasons, we reverse the decision of the court of appeals and remand for further proceedings consistent with this opinion.

Reversed and remanded.


HENNESY, J., not having been a member of the court at the time of submission, took no part in the consideration or decision of this case.

D I S S E N T

PROCACCINI, Justice (dissenting).

Because I would conclude that our state's dog-bite statute, Minnesota Statutes section 347.22 (2022), does not plainly, clearly, and unmistakably waive the State's sovereign immunity, I respectfully dissent. To be clear, this outcome would not leave Berrier without a potential remedy. As all parties agree, even without a waiver of the State's sovereign immunity under section 347.22, Berrier could still pursue her common law negligence claim against the Minnesota State Patrol.

A.

My contrary view of the law is grounded in the high bar that our Legislature set for itself when it comes to a waiver of the State's sovereign immunity. The Legislature has established that, to waive sovereign immunity, a statute must either (1) explicitly name the State, or (2) its words must be "so plain, clear, and unmistakable as to leave *no doubt* as to the intention of the legislature." Minn. Stat. § 645.27 (2022) (emphasis added). Because the dog-bite statute does not expressly name the State, we must apply the "no doubt" standard to determine if the Legislature otherwise indicated its intent to waive sovereign immunity.

This "no doubt" standard is more exacting than the standard to overcome the presumption of innocence in a criminal case, which requires the State to prove every element of the charged offense *beyond a reasonable* doubt. *State v. Peterson*, 673 N.W.2d

482, 486 (Minn. 2004).[1]  In other words, Minnesota courts may affirm the guilt of a criminal defendant (and potentially deprive them of their liberty) upon a lesser showing than is necessary for a statute to waive the State's sovereign immunity.[2]

The majority concedes that the "no doubt" standard is exacting but then asserts that we cannot apply the standard's plain language, as doing so would make the second clause of section 645.27 superfluous.  Instead, the majority claims that—when applying the standard—we must consider its purpose, the context in which it was codified, and the circumstances in which it is applied.  In other words, the majority dismisses the text that the Legislature wrote to direct the interpretation of its own acts, substituting that text for the court's assessment of what "no doubt" means based on considerations beyond the standard's plain language.  This approach misses the mark for at least two reasons.

First, the "aim of statutory analysis is to effectuate the intent of the legislature." *State v. Pakhnyuk*, 926 N.W.2d 914, 920 (Minn. 2019) (citations omitted) (internal quotation marks omitted).  As we have said since the year of our statehood, the words of a statute—as enacted by the Legislature—are the best evidence of that intent.  *Minn. & Pac. R.R. Co. v. Sibley*, 2 Minn. 13, 20 (1858) ("In construing a statute . . . , the great object is to ascertain and interpret so as to carry out the intention of the lawgiver; and as a primary rule, the language used is to be first considered, as being the best evidence of what that

---

[1]    We once noted that proof "beyond a reasonable doubt" was "the highest standard of proof." *Jacobson v. $55,900 in U.S. Currency*, 728 N.W.2d 510, 526 n. 9 (Minn. 2007). It seems that we were not accounting for the "no doubt" standard set forth in section 645.27.

[2]    When asked at oral argument, counsel for both parties acknowledged that they were unaware of any other statute that sets such a high bar.

intention is."); *see also Rodriguez v. State Farm Mut. Auto. Ins. Co.*, 931 N.W.2d 632, 634 (Minn. 2019) ("The plain language of the statute is our best guide to the Legislature's intent."). Accordingly, "[w]hen interpreting a statute, the first question is whether the language of a statute is ambiguous. The plain language of the statute controls when the meaning of the statute is unambiguous." *Pakhnyuk*, 926 N.W.2d at 920 (citations omitted) (internal quotation marks omitted). And, when a statute is unambiguous, "the letter of the law shall not be disregarded under the pretext of pursuing the spirit." Minn. Stat. § 645.16 (2022). The Legislature could have set a lower standard when drafting section 645.27—or later amended it to be more lenient—by adopting, for example, a "beyond a reasonable doubt" framework, but it chose more stringent language: "no doubt." These words, and the Legislature's intent, could not be clearer.

Second, even if we could set aside the statute's unambiguous "no doubt" language, there is simply no evidence to support the majority's assertion that we have interpreted section 645.27 more leniently under a so-called "modern approach." The majority grounds its "modern approach" in our precedent interpreting the Tort Claims Act. *See* Minn. Stat. § 3.736 (2022); *Nusbaum v. Blue Earth County*, 422 N.W.2d 713, 719 (Minn. 1988) (discussing the development of the doctrine of sovereign immunity in Minnesota following our decision in *Nieting v. Blondell*, 235 N.W.2d 597 (Minn. 1975), and the passage of the Tort Claims Act). As discussed below, arguments about the Tort Claims Act are not properly before us. And neither the "no doubt" framework guiding our decision in this case, nor our approach to applying that framework to statutory claims, has changed in over eight decades.

*Nichols v. State*, decided less than a decade ago, is our most recent substantive application of the "no doubt" standard. 858 N.W.2d 773 (Minn. 2015).[3] Far from recognizing a "modern approach" in *Nichols*, we reiterated our longstanding and stringent view that "sovereign immunity is waived only if the statute demonstrates the Legislature's express intent to allow suit against the State." *Id.* at 776. The history and application of section 645.27 over the past eight decades show that there has been no shift in how we apply this exacting standard.

Section 645.27 was enacted in 1941[4] to provide a "*framework* for interpreting whether a separate statutory provision waives sovereign immunity." *Nichols*, 858 N.W.2d at 776. The common law of sovereign immunity long predates the State of Minnesota. *See, e.g.*, *United States v. Hoar*, 26 F. Cas. 329, 330 (C.C.D. Mass. 1821) (No. 15,373). The common law doctrine set a high bar, providing that the sovereign "is not bound by the words of a statute *unless named therein*, if the statute tends to restrain or diminish the powers, rights, or interests of the sovereign." *United States v. Herron*, 87 U.S. 251, 255 (1873) (emphasis added); *see also Hoar*, 26 F. Cas. at 330 (concluding "that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and indisputable upon the text of the act").

---

[3]    In 2016, we briefly referred to section 645.27 on our way to squarely rejecting an argument that the State had ceded a portion of its sovereignty by enacting the Multistate Tax Compact. *See Kimberly-Clark Corp. & Subsidiaries v. Comm'r of Revenue*, 880 N.W.2d 844, 849 (Minn. 2016). Otherwise, we have not cited section 645.27 since our decision in *Nichols*.

[4]    *See* Act of Apr. 28, 1941, ch. 492, § 27, 1941 Minn. Laws 907, 914.

We have recognized that this strict common law standard, endorsed and carried forward by the Legislature in section 645.27, protects the State's legitimate interest in fiscal integrity and financial stability by shielding it from liability in some circumstances. *Lienhard v. State*, 431 N.W.2d 861, 867 (Minn. 1988).[5] But it plays a broader and perhaps even more important role in ensuring that the Legislature does not mistakenly apply statutory regulations, restrictions, and limitations to the State when it has no intention to do so. By setting such a high threshold, the Legislature protects itself from painting with too broad a brush.

Turning to the statute at issue, the relevant language provides that:

> If a dog, without provocation, attacks or injures any person who is acting peaceably in any place where the person may lawfully be, the owner of the dog is liable in damages to the person so attacked or injured to the full amount of the injury sustained. The term "owner" includes any person harboring or keeping a dog but the owner shall be primarily liable.

Minn. Stat. § 347.22. The majority concludes that the words "the owner," as used in the statute, are "so plain, clear, and unmistakable as to leave no doubt as to the intention of the legislature" to bind the State. Minn. Stat. § 645.27. That conclusion is at odds with our

---

[5] The majority cites *Spanel v. Mounds View School District No. 621*, 118 N.W.2d 795 (Minn. 1962), to support its argument that we have repudiated certain interests served by tort immunity doctrines. But *Lienhard* came over 25 years *after* our decision in *Spanel* and "reaffirm[ed] our earlier recognition that the protection of a governmental entity's financial stability is a legitimate public purpose." *Lienhard*, 431 N.W.2d at 867.

previous holdings, our longstanding practice and understanding, and the well-founded doubts harbored by the court of appeals.[6]

We have previously (and recently) held that broad, general language in an act is insufficient to waive sovereign immunity. In *Nichols*, we addressed whether provisions prohibiting fraudulent inducement to employment sufficed. 858 N.W.2d at 776. The language of the act at issue there was expansive, binding "any person, partnership, company, corporation, association, or organization of any kind." *Id.* (quoting Minn. Stat. § 181.64 (2014)). We reasoned that, even though "an expansive definition of 'organization' *could* encompass the State, it could just as easily refer only to business or other nongovernmental entities." *Id.* at 777. Because that " 'expansiveness' really has no practical limitation," and because the Legislature "has applied the brakes to [that] kind of analysis . . . by requiring a waiver of sovereign immunity to be plain, clear, and unmistakable," the statute did not bind the State. *Id.* We concluded that the "broad categories of entities" listed in the statute did not waive sovereign immunity. *Id.*

Our holding in *Nichols*—that a statute applicable to general categories of potential defendants that *could* include the State is insufficient to waive sovereign immunity—is

_____

[6]    The unanimous court of appeals decision in this case is consistent with *McClendon v. Roy*, No. A19-0528, 2019 WL 6112448 (Minn. App. Nov. 18, 2019), a nonprecedential opinion, in which the court of appeals—again unanimously—concluded that the State was immune from liability under the dog-bite statute. *See Berrier v. Minn. State Patrol*, 992 N.W.2d 421, 427 n.3 (Minn. App. 2023).

consistent with the longstanding understanding of section 645.27. Opinions of the

Attorney General show how the statute was interpreted in the years after its enactment.[7]

In 1947, six years after the Legislature enacted section 645.27, the Attorney General

examined a law that broadly applied licensing and inspection requirements to various

structures and buildings, including restaurants and other "places of refreshment." Op.

Att'y Gen. No. 238-J, at 1 (Dec. 23, 1947) (citing Minn. Stat. §§ 157.01–.15 (1945)).

The Minnesota Department of Health—the agency entrusted to enforce those

requirements—asked the Attorney General whether the statute applied to "feeding facilities

and cafeterias maintained and operated by public and private school systems." *Id.* at 1–2.

The Attorney General concluded that statutory requirements applied generally to cafeterias

and restaurants operated in connection with schools, including those operated by public

bodies. *Id.* at 2. Nonetheless, relying on section 645.27, the Attorney General concluded

that the requirements did not apply to "cafeterias and restaurants operated by the state." *Id.*

---

[7] Although opinions of the Attorney General do not bind us, "[w]hen appropriate" those opinions "are entitled to careful consideration by appellate courts, particularly where they are of long standing." *Billigmeier v. Hennepin County*, 428 N.W.2d 79, 82 (Minn. 1988). Moreover, the Attorney General's opinions provide additional evidence of how the section 645.27 framework has been applied in practice—a consideration that the majority improperly elevates over the statute's plain meaning.

The majority notes that the opinions of the Attorney General discussed below predate our decision in *Nieting*. *Nieting*—which abolished the doctrine of sovereign immunity for *common law* tort claims and prompted the passage of the Tort Claims Act—says nothing about section 645.27 or our longstanding understanding of how it applies to *statutory* tort claims. *See Nieting*, 235 N.W.2d at 601–03; *Nichols*, 858 N.W.2d at 775 ("Although we have abolished sovereign immunity with regard to common-law tort claims, the doctrine remains effective in many forms, including immunity from liability created by statute, which is, of course, subject to waiver by the Legislature." (citing *Nieting*, 235 N.W.2d at 603)).

Four years later, the Attorney General similarly concluded that the State was not required to file a power of attorney in mortgage foreclosure proceedings, Op. Att'y Gen. No. 301-C-1, at 1 (Dec. 26, 1951), despite a statute broadly requiring compliance "[w]hen *an attorney at law* is employed to conduct such foreclosure." Minn. Stat. § 580.05 (1949) (emphasis added). The State employed attorneys to conduct mortgage foreclosures, and it stands to reason that the Legislature was aware of that fact when crafting the statute. Nonetheless, the Attorney General determined that because the broadly worded statute did not refer to the State, it did not apply to the State under section 645.27. Op. Att'y Gen. No. 301-C-1, at 1.

Almost a decade later, in 1959, the Attorney General examined yet another issue of State immunity—this time related to whether the State was required to pay certain inspection fees. Op. Att'y Gen. No. 188-D, at 2–3 (May 4, 1959). The relevant statute broadly applied to "[a]ll electrical wiring, apparatus, and equipment for electric light, heat, and power." Minn. Stat. § 326.32 (1958). Again, the Legislature undoubtedly knew that State-owned buildings contained such "wiring, apparatus, and equipment." They were sitting in just such a building—the State Capitol—when they passed the provisions at issue in 1937. *See* Act of Apr. 21, 1937, ch. 314, § 8, 1937 Minn. Laws 428, 432–33 (codified as amended at Minn. Stat. § 326.32). But, relying on section 645.27, the Attorney General reasoned that the provisions did not apply because they "[did] not directly, indirectly, nor by inference, require that the State of Minnesota comply therewith." Op. Att'y Gen. No. 188-D, at 2–3.

D-8

Each of these opinions stands for a strict application of section 645.27, faithful to the "no doubt" standard.[8] To establish that the Legislature has waived sovereign immunity, it is not enough to show that the State *could* fall into a broad and general category encompassed by a statute. Instead, the statute's language must remove all doubt as to the Legislature's intention. Given the strict standard set out by section 645.27, our decisions in the eight decades since its enactment have almost uniformly concluded that the statutes at issue contained *no* waiver when the State is not expressly named.[9]

---

[8] Other opinions of the Attorney General are consistent with this strict application. *See* Op. Att'y Gen. No. 425-C, at 2–3 (Feb. 13, 1946) (applying section 645.27 to the statute of frauds and concluding it is not applicable to the State because the State "is not named" therein and "there can be said to be nothing in the language employed manifesting the intention of the legislature to bind the State"); Op. Att'y Gen. No. 423-C, at 2–3 (Aug. 27, 1948) (applying section 645.27 to provisions imposing limitations on the issuance of expiration notices on tax judgment certificates, and holding that those provisions do not apply to the State because it is not named therein, "nor does it appear in plain, clear, unmistakable language which leaves no doubt as to the intention of the legislature that it applies to the state"); Op. Att'y Gen. No. 59-A-9, at 1–2 (July 5, 1949) (applying section 645.27 to a legislative act authorizing an improvement to a state hospital and holding that the State did not need to comply with local permitting requirements because the act did not so provide); Op. Att'y Gen. No. 107-A-8, at 2 (Jan. 12, 1951) (applying section 645.27 to a statute requiring a party who misplaces a municipal payment warrant to furnish a bond and holding that the provisions at issue do not apply to the State because "there is no expressed legislative intent that a governmental subdivision" adhere to that requirement).

[9] *See Nichols*, 858 N.W.2d at 779; *Holmberg v. Holmberg*, 588 N.W.2d 720, 727 (Minn. 1999) (holding that a statute requiring a court to award attorney fees if "the party from whom fees are requested has the means to pay the fees" did not apply to the State because it contained "no indication that the legislature meant it to apply to the state"); *Winberg v. Univ. of Minn.*, 499 N.W.2d 799, 801–02 (Minn. 1993) (stating that if the Legislature intended the Veterans Preference Act to apply to the University of Minnesota, it likely would have included the University by specific reference); *AFSCME Councils 6, 14, 65 and 96 v. Sundquist*, 338 N.W.2d 560, 567–68 (Minn. 1983) (holding that the Legislature's promise to give pension benefits to public employees was not an implied-in-

The majority's claim that strictly applying section 645.27 would nullify the statute's "no doubt" clause is similarly unsupported by our precedent. We have at least once discussed the kind of language that suffices to meet this strict standard and bind the State without expressly naming the State. In *Star Tribune Co. v. University of Minnesota Board of Regents*, the question was whether the University of Minnesota was subject to the requirements of the Open Meeting Law—a law that ensures transparency in governmental proceedings. 683 N.W.2d 274, 280–81 (Minn. 2004). We held that the law applies to the University due to the law's "broadly inclusive language" encompassing a "public body," "our numerous opinions recognizing the University as a public institution, the failure of the legislature to include the University among other expressly-stated exceptions, and our principle of construing the Open Meeting Law to favor public access."[10] *Id.* at 281 (internal

---

fact contract to maintain employee pension contributions at a fixed level during employment); *Beltrami County v. Marshall*, 135 N.W.2d 749, 753–54 (Minn. 1965) (holding that the State was not required to pay the costs of municipal prosecutions, as "any partial deduction" from the State's earnings to cover those fees "is nowhere spelled out in any of the statutes involved"); *State ex rel. Lord v. Anderson*, 87 N.W.2d 928, 928 (Minn. 1958) (stating that a statute providing costs and disbursements to the prevailing party on appeal cannot be applied to the State because it "is not expressly applicable to the state"); *State v. Bentley*, 28 N.W.2d 770, 771 (Minn. 1947) (stating that a statute providing costs to the prevailing party on appeal does not apply to the State because it "does not indicate an intent that it should be applicable to the state"); *see also Nelson v. McKenzie-Hague Co.*, 256 N.W. 96, 97 (Minn. 1934) (holding that the State was not bound by a statute imposing liability for private nuisance because it was not explicitly or impliedly included in the statute).

[10]     In *Star Tribune Co.*, the University cited *Winberg v. University of Minnesota* for the proposition that the University is not subject to a law unless the law expressly includes the University. *Star Trib. Co.*, 683 N.W.2d at 281 (citing *Winberg*, 499 N.W.2d 799 (Minn. 1993)). In *Winberg*, we cited to section 645.27 and concluded that the University "would not be bound by the Veterans Preference Act unless explicitly named." *Winberg*,

quotation marks omitted). *Star Tribune Co.* provides an example of statutory text sufficient to waive sovereign immunity without expressly naming the State, giving meaning to the "no doubt" clause of section 645.27 and negating the majority's concern. And, although we referred to the purpose served by the statute in deciding whether it applied to the State, that purpose was clearly applicable only to public bodies. We have explained that the Open Meeting Law serves several related purposes:

> (1) to prohibit actions being taken at a secret meeting where it is impossible for the interested public to become fully informed concerning [public bodies'] decisions or to detect improper influences; (2) to assure the public's right to be informed; and (3) to afford the public an opportunity to present its views to the [public body].

*Prior Lake Am. v. Mader*, 642 N.W.2d 729, 735 (Minn. 2002) (alterations in original) (citation omitted) (internal quotation marks omitted). Hence, the law is expressly aimed at promoting governmental accountability and transparency, rather than furthering more general aims that could involve both State and non-State entities.

Neither the language nor the purpose of the dog-bite statute is nearly so explicit as to fall into the category of laws contemplated in *Star Tribune Co.* The dog-bite statute contains no language indicating that it is directed toward public bodies, the government, or the State. Instead, it generally binds "the owner" of a dog, encompassing a class of potential defendants far more general than the few that qualify as public bodies under the Open Meeting Law. Similarly, the dog-bite statute was "designed for the protection of

---

499 N.W.2d at 802. In *Star Tribune Co.*, we declined to extend *Winberg's* logic in the context of the Open Meeting Law. *Star Trib. Co.*, 683 N.W.2d at 281 (citing *Winberg*, 499 N.W.2d at 801–02).

people who are subject to attacks and immediate harm from dogs," a purpose applicable to seemingly *any* person or entity, unlike the inherently government-focused goals served by the Open Meeting Law. *Lewellin v. Huber*, 465 N.W.2d 62, 65 (Minn. 1991).

The proper inquiry is not whether the State *could* be the owner of a dog. Instead, we apply the framework of section 645.27 and ask whether the use of the term "the owner" is so plain, clear, and unmistakable as to leave no doubt that the Legislature intends to bind the State. Minn. Stat. § 645.27. Like *Nichols*, even if an expansive definition of the term "the owner" "*could* encompass the State, it could just as easily refer only to" other, non-State entities. 858 N.W.2d at 777. "The Legislature has applied the brakes" to that type of analysis—which asks whether an expansive definition of a statutory phrase *could* theoretically include the State—through the exacting "no doubt" standard set by section 645.27. *Id.*

The majority argues that *Nichols* is distinguishable from the present case because the phrase "any organization" is more clearly confined to non-State, business entities, whereas the phrase "the owner" in the dog-bite statute applies to *any* potential defendant in a class, including the State. We expressly rejected this reasoning in *Nichols*. *See id*. The Legislature was no more signaling its intention to waive the State's sovereign immunity when it referred to "the owner" of a dog than it did by drafting a statute to bind "any organization." Both definitions are broad and *could* include the State. It makes no difference that one arguably encompasses a smaller class of defendants.

The majority's attempt to distinguish *Nichols* is further belied by our previous decision to uphold sovereign immunity where the State *could* have been the defendant

subject to a statutory claim and the phrase at issue was just as broadly inclusive as the phrase "the owner." In *Holmberg v. Holmberg*, 588 N.W.2d 720, 727 (Minn. 1999), we held that a statute did not waive sovereign immunity by requiring a court to award attorney fees if "*the party* from whom fees, costs, and disbursements are sought has the means to pay them." Minn. Stat. § 518.14, subd. 1(2) (1998) (emphasis added). The respondents requested attorney fees from the State, a request that we denied. *Holmberg*, 588 N.W.2d at 727. The State, as a respondent-intervenor, *could* have been "the party" from whom attorney fees were sought under the statute, but section 645.27 required some "indication that the legislature meant it to apply to the State." *Id.* Despite the statute's use of the broadly inclusive phrase "the party," we nonetheless concluded that the words of the statute were insufficient to waive sovereign immunity. *Id.* Similarly, although the State Patrol *could* be "the owner" contemplated by the dog-bite statute, that does not mean that the statute waives sovereign immunity.

Until this case, we have not relied on semantic hairsplitting to discern whether the Legislature has plainly, clearly, and unmistakably waived the State's sovereign immunity. Instead, we have required some "indication" of the Legislature's intent to bind the State beyond the State's inclusion in a general category. *Id.*; *see also State v. Bentley*, 28 N.W.2d 770, 771 (Minn. 1947) (holding that a statute providing for the allowance of costs to the prevailing party did not apply to the State because the statute "does not indicate an intent that it should be applicable to the state"). As in *Holmberg* and *Bentley*, there is simply no indication that the Legislature intended to bind the State to the statute at issue.

The majority also relies on *Hyatt v. Anoka Police Department*, where we held that a municipal police department can be held liable under the dog-bite statute. 691 N.W.2d 824, 828 (Minn. 2005). Recognizing that the word "owner" includes "any person" harboring or keeping a dog, that the modifier "any" has broad application in statutes, and that the term "person" includes "bodies politic" like municipalities, we subjected the municipality to liability. *Id.* at 826–27 (citing Minn. Stat. § 645.44, subd. 7 (2004) (stating that the term " '[p]erson' may extend and be applied to bodies politic and corporate")) (internal quotation marks omitted). But *Hyatt* does not apply here because we did not analyze the dog-bite statute through the lens of the framework established in section 645.27. Instead, we applied our standard principles of statutory interpretation, and we considered neither municipal nor sovereign immunity. *Id.* at 826–28.

In contrast to *Hyatt*, *Nichols* addressed whether statutory language was sufficiently clear to waive sovereign immunity, so its reasoning is instructive. Like *Nichols*, although some interpretations of "the owner" of a dog, "any person harboring or keeping a dog," and "bodies politic," Minn. Stat. §§ 347.22, 645.44, subd. 7, "*could* encompass the State," they could also refer only to private persons, municipalities, and other non-State entities. *Nichols*, 858 N.W.2d at 777. The question[11] is whether a statute's language leaves "no

_____

[11] Berrier also argues that the dog-bite statute's classification as an absolute liability statute precludes the application of the doctrine of sovereign immunity. Although the majority does not expressly endorse this argument, it reasons that the way in which we construe absolute liability statutes favors holding that the dog-bite statute waives sovereign immunity. I disagree with this reasoning. Section 645.27 asks whether "the words of the act are so plain, clear, and unmistakable as to leave no doubt as to the intention of the legislature." Minn. Stat. § 645.27. By looking to how we construe absolute liability

doubt" that the Legislature intended to bind the State. Minn. Stat. § 645.27. That this issue may be a close call means there is doubt as to the Legislature's intent to bind the State. The court of appeals has twice reached the same conclusion, determining that there is doubt as to the Legislature's intent.[12] For these reasons, I would hold that the dog-bite statute does not waive sovereign immunity.

The majority suggests that its holding will have limited impact on the State, as its decision waives sovereign immunity *only* for the dog-bite statute, and *only* three state agencies own dogs, none trained in bite-related work. This ignores the reality that, although the dog-bite statute is narrow in scope, section 645.27 has wide-ranging applications. The majority's holding substantially lowers the bar for a statute to waive the State's sovereign immunity. The State engages in all sorts of activities on behalf of Minnesotans. It employs tens of thousands of employees who work in its offices, hospitals,

---

statutes, the majority's reasoning goes beyond "the words of the act," exceeding the limits of the inquiry permitted by section 645.27.

Absolute liability statutes determine the *extent* of a claimant's recovery by precluding the application of comparative fault principles. *Seim v. Garavalia*, 306 N.W.2d 806, 812 (Minn. 1981). They do not, as Berrier suggests, determine *who* can be held liable under a statute. On those grounds, I would reject this argument outright.

[12]     In the context of qualified immunity, we have noted that a "right is clearly established when there is controlling authority or a robust consensus of cases of persuasive authority." *McDeid v. Johnston*, 984 N.W.2d 864, 873 (Minn. 2023) (citation omitted) (internal quotation marks omitted). The United States Supreme Court has explained that the converse may also be true—a *lack* of consensus among appellate courts can show that a right is *not* clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 245 (2009). Here, our conclusion turns on whether the Legislature spoke so plainly, clearly, and unmistakably that there is *no doubt* about its intent to subject the State to liability. Per *McDeid* and *Pearson*, we should not ignore the lack of consensus among our court and the court of appeals as we consider whether doubt exists here.

D-15

parks, prisons, and courts. It provides services, assistance, and grants to countless people and organizations. Just as the term "owner" *could* include the State, now any other term that *could* include the State might suffice to waive sovereign immunity. This not only exposes the State to unexpected liability in lawsuits but also means that the State may now arguably be subject to various statutory regulations and restrictions. *See Star Trib. Co.*, 683 N.W.2d at 281 (holding that the University of Minnesota is subject to the terms of the Open Meeting Law). The majority's holding will not have the limited impact it claims.

B.

My disagreement with the court's application of section 645.27 requires me to address Berrier's alternative, but tardy, argument that the Tort Claims Act, Minnesota Statutes section 3.736, abolished the doctrine of sovereign immunity for all statutory tort claims. Berrier concedes that she did not make this argument at the district court or court of appeals, in her petition for review, or in her principal brief to our court. Indeed, in her briefing to the district court and court of appeals, Berrier asserted the *opposite* position, conceding that our court "abolished sovereign immunity for common law tort claims, but immunity still exists for claims created by statute." Her new argument related to the Tort Claims Act is diametrically opposed to her previous position. An amicus curiae raised this new position in its brief to our court supporting Berrier's claim, and Berrier then echoed the argument for the first time in her reply.

While Berrier's newfound argument may well prove persuasive in a future case, it would be inappropriate for us to consider it here. Under our longstanding and sensible jurisprudence, Berrier forfeited her Tort Claims Act argument by failing to raise it below

or in her petition for review. *See Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn. 1988) (stating that a party may not obtain review on "the same general issue litigated below but under a different theory" and concluding that the court of appeals improperly considered a question not litigated in the district court); *State v. Hunn*, 911 N.W.2d 816, 821 (Minn. 2018) (declining to reach an issue not raised in appellant's petition for review, and "not urged before, or considered by, the district court or the court of appeals"); *see also New Jersey v. New York*, 523 U.S. 767, 781 n.3 (1998) (passing over "the arguments of the named *amici* for the reason that New York, the party to the case, has in effect renounced them, or at least any benefit they might provide").

We generally do "not consider arguments raised for the first time on appeal," nor do we "decide issues raised solely by an amicus." *Hegseth v. Am. Fam. Mut. Ins. Grp.*, 877 N.W.2d 191, 196 n.4 (Minn. 2016). Rather, an amicus "must accept the case before the court with the issues made by the parties" and "ordinarily cannot inject new issues into a case that have not been presented by the parties." *Kline v. Berg Drywall, Inc.*, 685 N.W.2d 12, 23 n.9 (Minn. 2004). Although we may consider any issue in the interests of justice, *In re GlaxoSmithKline PLC*, 699 N.W.2d 749, 757 (Minn. 2005), including an issue raised solely by an amicus, we typically do so only if the issue is one that we could raise sua sponte. *Kline*, 685 N.W.2d at 23 n.9. This is not one of those rare instances.

Berrier's novel Tort Claims Act argument originated in an amicus brief submitted to our court after Berrier submitted her principal brief.[13] There are good reasons to reject this belated bid to introduce a new argument. For one, such an argument leaves us "without the benefit of thorough lower court opinions to guide our analysis of the merits." *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012). For another, it is unfair to an unsuspecting opposing party, who must scramble to address new and potentially unfamiliar issues without warning or an adequate opportunity to respond. *See State v. Myhre*, 875 N.W.2d 799, 806 (Minn. 2016) (declining to consider issues not raised in a petition for review or thoroughly developed in the appellant's brief when doing so would "inhibit[] the respondent's ability to argue the issue to our court"). This also goes for non-parties who may have an interest in the case but have *no* opportunity to respond to late-breaking arguments. *See, e.g.*, *Torres v. JAI Dining Servs. (Phoenix), Inc.*, 508 P.3d 1148, 1152–53 (Ariz. App. 2022), *vacated on other grounds*, 536 P.3d 790 (Ariz. 2023) (stating that when an appellate court considers an issue "raised for the first time on appeal," to "prevent unfair surprise, the court should afford the parties a full opportunity to brief and argue the issue, and when appropriate, allow participation by amicus curiae as well"); *cf. State v. Allen*, 706 N.W.2d 40, 43 (Minn. 2005) (stating that in rare cases we may consider issues for the first time on appeal when doing so will not work an unfair surprise on a party).

---

[13] Although the same amicus curiae also filed a brief in support of Berrier's position at the court of appeals, it did not raise the Tort Claims Act issue at that stage of the proceedings.

This impact on non-parties is particularly important here. Berrier's Tort Claims Act argument, properly raised, would have interested many parties. Had those parties known of this issue—which substantially broadens the potential impact of this case and the State's exposure to tort liability—they could have moved to act as amici below and in our court. Amici could have aided our understanding, and informed our consideration, of the argument. Resolving Berrier's appeal via the Tort Claims Act, rather than under the section 645.27 framework, is the difference between exposing three executive branch agencies to liability under the dog-bite statute and exposing every entity within all three branches of state government to liability under every statutory tort. There may well be compelling reasons to adopt such a holding in a future case, but addressing the issue under the current circumstances would not serve the interests of justice.

*   *   *

In sum, I would hold that the dog-bite statute does not waive sovereign immunity, conclude that the Tort Claims Act issue was forfeited, and affirm the decision of the court of appeals. Such a decision would allow Berrier to pursue her common law negligence claim against the State Patrol, preserve our court's longstanding application of sovereign immunity to statutory claims, and leave for another day the belatedly raised question about the Tort Claims Act.

For these reasons, I respectfully dissent.


HUDSON, Chief Justice (dissenting).

I join in the dissent of Justice Procaccini.

D-19



About
Drugged Driving and DRE Training
History
Special Assignments
Aviation Section
Minnesota Air Rescue Team
Capitol Security
Communications
K-9 Unit
Crash Reconstruction Specialist
Drug Recognition Evaluator
Public Information
Trooper Special Response Team
Vehicle Crimes Unit
Join the State Patrol
District Map
Employment Opportunities
FAQ
State Patrol Mission
Law Enforcement Training
State Patrol Squad Cars
Expand All | Collapse All

# K-9 Unit

## About

The Minnesota State Patrol K-9 unit is currently staffed with 15 K-9 teams trained to detect the odor of narcotics, and one team trained to detect explosives. The State Patrol's dogs are not trained in other typical police functions such as apprehension or tracking. They live with their State Trooper handlers' families.

The K-9s are responsible for sniffing out illegal drugs destined for Minnesota communities each year. All Minnesota State Patrol K-9 teams regularly respond to requests for assistance from allied law enforcement agencies.

Requests range from assisting other troopers on traffic stops, to assisting local law enforcement where drugs are believed to be hidden inside houses, vehicles or other structures.



## Breeds

The dogs are Belgian Malinois, German Shepherd, Dutch Shepherd, German short hair and wire hair pointers. The unit also consists of a Hungarian Vizsla, which is the patrols only explosive detecting K-9.



## Training

These dogs are trained to sniff loaded semi-trailers by walking on top of the cargo, or by squeezing through gaps in the cargo, to check the entire length of the trailer. They are able to do this in a fraction of the time it would take a human to search the same vehicle.

Troopers and their K-9 partners meet as a group for two days of training each month, and handlers perform maintenance training throughout the month. This regular training is imperative for both the dog and handler to maintain their high level of performance.



## Duties

K-9 teams are stationed in various parts of the state. All Minnesota State Patrol K-9 Troopers regularly respond to requests for assistance from a variety of allied law enforcement agencies. Requests range from assisting other Troopers on traffic stops, to assisting local law enforcement where drugs are believed to be hidden inside houses or other structures.

Privacy Policy  |  Terms and Conditions  |  Accessibility  |  Copyright © 2024 MN DPS
An equal opportunity employer. Women, minorities, and individuals with disabilities are encouraged to apply.